## ROMINE v. HODGES.
### Patent Appeal No. 3216.

Court of Customs and Patent Appeals.
April 23, 1934.

Cushman, Darby & Cushman, of Washington, D. C. (John J. Darby, of Washington, D. C., of counsel), for appellant.

George H. Willits, of Detroit, Mich., and Arthur W. Davidson, of Washington, D. C., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences awarding priority of invention to appellant, Robert T. Romine.

The alleged invention relates to improvements in an industrial power-driven truck of the type having a low platform, adapted to be placed under a loaded portable platform, and the necessary mechanism for raising and lowering it. The particular features of the invention here involved are fully set forth in the count at issue. It reads: "In an industrial power driven truck, a frame comprising a main portion at one end and a load supporting portion disposed adjacent the ground, a platform surmounting said load supporting portion, a pair of power driven steering wheels beneath said main portion, two pairs of relatively small load supporting wheels beneath said platform and spaced longitudinally thereof, a sub-frame member carrying said load wheels, a pivotal connection between said member and said frame to permit rocking movement of the sub-frame member about a fixed axis, the axis of said pivotal connection extending transversely of the frame between said longitudinally spaced pairs of load wheels, and means for steering certain of said load wheels."

The applications of the parties were filed as follows: Appellant, Romine, June 25, 1926, serial No. 118,584; appellee, Hodges, June 3, 1926, serial No. 113,476. As appellant, Romine, was the junior party, the burden was upon him to establish priority of invention by a preponderance of the evidence.

In his preliminary statement, appellant claimed that he conceived the invention "in or about June, 1924"; that he disclosed it to others "in or about July, 1924"; that he reduced it to practice in August, 1925, by embodying it in a full-size operative truck manufactured by the Elwell-Parker Electric Company of Cleveland, Ohio; that thereafter certain changes were made in the truck, and it was successfully operated in September, 1925; and that in June and July, 1926, the first complete written description of it was made.

Appellee, in his preliminary statement, alleged that he conceived the invention on or about the first of June, 1923; that the first drawing disclosing it was made on or about November 15, 1923; that he reduced it to practice on or about April 15, 1924, by embodying it in a full-size operative truck; and that the first written description of it was made on or about July 16, 1925.

At the time the case was presented to the tribunals of the Patent Office, one Edward H. Remde was also a party, and a considerable portion of the discussion in the opinions of those tribunals relates to the case presented by him. He did not appeal from the decision of the Board of Appeals, and is therefore no longer a party in this proceeding.

Although appellant contended before the tribunals below, and submitted some evidence which he claimed supported his contention, that he conceived the invention in June, 1924, the Examiner of Interferences and the Board of Appeals concurred in holding that the evidence was insufficient to warrant a finding sustaining such contention.

We have carefully examined the evidence, and are of opinion that the tribunals below were right in so holding.

. Relative to appellant's conception of the invention and his reduction of it to practice, the Examiner of Interferences said:

"Romine has offered a considerable amount of evidence as to his activities between April 2 and May 4, 1925. He testifies that he employed Warren during the first part of April and immediately took up with him the matter of the ten ton truck. A sketch said to have been made by Warren on April 4, 1925, is produced as Romine exhibit 103. This sketch is identified by Warren and Romine as having been made on that date and Parks testifies that he saw it in May of that year. The exhibit differs from the structure in issue in that it shows two sub-frame members, one at each side, and a longitudinally extending axle. However, Romine and Warren agree that the former, when the sketch was first submitted to him, suggested that this axle be omitted and that the sub-frame members be joined. These changes, the manner of making which would be obvious, would produce a device satisfying the count.

"Subsequent to this suggestion by Romine, Warren made a further sketch (Romine exhibit 105), dated April 23, 1925, which is identified by himself and by Romine and which Parks also saw in May of 1925. This sketch indicates that Romine's suggestions were adopted, since the longitudinal axle is not shown and the wheels are mounted on a single sub-frame. It is thought that the existence of these sketches as early as May 1925 is sufficiently established by the testi-

mony of Warren and Romine and that, together with that testimony, the sketches establish conception of the invention by Romine at that time. The details of the steering mechanisms are not shown, or fully described, but it is thought that these could be worked out by any mechanic. The sketches clearly indicate that the load wheels are to be used in steering. It is held that Romine conceived the invention in issue prior to June first, 1925.

"Shortly after the first of June 1925, drawings were made by the Elwell Parker Company for Romine. The first of these drawings, which Cochran states was completed on June 20, 1925, and which forms Romine exhibit 112, fully discloses the invention in issue and affords further proof of conception by Romine at least as early as that date. The construction of two trucks embodying the invention in issue was carried out by the Elwell Parker Company and the testimony of Romine, Warren, Cochran, and McReavy amply establishes that the first truck was completed in September 1925 and fully tested then and in October. Romine is therefore accorded a date of reduction to practice in October, 1925."

So far as the issues here are concerned, the greater portion of the Board's decision is devoted to a discussion of the evidence submitted by appellee. There is but slight reference in its decision to the evidence submitted by appellant, relative to his conception of the invention and his reduction of it to practice. There is no holding that the Examiner of Interferences erred in awarding appellant not later than June 1, 1925, for conception of the invention, and October, 1925, for reduction to practice. We think that it was the intention of the board to affirm those findings. In any event, we are of opinion that the findings of the Examiner of Interferences in that regard are supported by the evidence.

It appears from the record that appellee, Hodges, during the years 1923, 1924, 1925, and later, was employed by the Buick Motor Car Company as superintendent of maintenance; and that he had under his supervision the general repair department 89–C, in factory 25, electric truck repair department 89–D, and the foreman's department 99–B, in factory 25.

Appellee and his witnesses Clark, Fleming, and Cooke, all employees of the Buick Motor Car Company, testified to the construction of two trucks, each of five-ton capacity, conforming to the count in issue. The truck first constructed was identified in

the record as No. 96, and the second as No. 77. Originally, they were electric lift trucks of two-ton capacity, made by the Elwell-Parker Company of Cleveland, Ohio, and rebuilt by the witness Fleming so as to embody the invention in issue.

The sole question in the case, therefore, as we view it, is whether the first of those trucks, No. 96, was constructed during the period from the latter part of November or the early part of December, 1923, to the latter part of June, 1924, and the second, No. 77, later in the year 1924. If they were, appellee is entitled to an award of priority, and the decision of the Board of Appeals should be affirmed. If they were not constructed until 1925, as held by the Examiner of Interferences, appellant is entitled to an award of priority, and the decision of the board should be reversed.

The tribunals below concurred in holding that the evidence of record was not sufficient to establish conception of the invention by appellee prior to the completion of the truck first constructed, No. 96. Appellee did not, and, strange as it may seem, made no apparent effort to, establish conception of the invention *defined in the involved count* at a date prior to the completion of truck No. 96, and, even if it be assumed that he conceived the invention at some time prior thereto, a finding in his favor, in view of the facts of record, *could not be based upon such assumption.*

The Examiner of Interferences reviewed the testimony introduced by appellee at considerable length. He held that appellee had failed to establish that the involved invention was embodied in trucks Nos. 96 and 77 in the year 1924; that appellee's activities in regard thereto did not take place until 1925; that truck No. 96, the first of the two trucks to be constructed, was not finished until subsequent to June 1, 1925; that appellee failed to establish conception of the invention prior to the completion of that truck; and that, as appellant was entitled to a date not later than June 1, 1925, for conception of the invention, and as he was diligent in reducing it to practice, he was entitled to an award of priority. In his decision, the Examiner, among other things, said:

"Hodges' claim that he built a truck satisfying the count in 1923 and 1924 rests almost entirely upon the oral testimony of interested witnesses given many years after the events and based on recollection. *This testimony, for the reasons above pointed out, cannot be reconciled with the documentary*

*evidence, which clearly indicates that the events described by the witnesses as occurring in 1924 did not actually take place until 1925.* It is accordingly held that Hodges has failed to show that the truck described by his witnesses was made in 1924.

"While it appears that the Hodges truck was built during 1925, there is not sufficient evidence to warrant a holding as to the exact time when it was completed. However, in view of the testimony of Fleming (Q. 7) that the truck was completed 'about the latter part of June,'· the statement of Hodges that it was 'the early part of the summer,' and the letter (Romine exhibit 136) dated September 29, 1923, [1925] and stating that Hodges 'now advises' that he has completed the truck, it is clear that this event was subsequent to the first of June 1925. Since there is no evidence, aside from this truck, to indicate a conception by Hodges of the invention in issue, it must be held that his conception was subsequent to that of Romine and that, in view of the diligence of the latter, Hodges cannot prevail, regardless of his date of reduction to practice." (Italics ours.)

In its decision reversing the decision of the Examiner of Interferences and awarding priority of invention to appellee, the Board of Appeals stated that the invention was simple, involving "nothing more than placing two axles instead of one beneath the low platform, mounting these axles in such a way that they may rock about a horizontal transverse axis and providing the wheels with steering means," and that the evidence produced by the parties was so unsatisfactory that it was difficult to determine which of them had presented the most reliable proof. After discussing somewhat generally the testimony submitted by appellee, and stating that appellee and his witnesses Clark, Fleming, and Cooke had told a "consistent story" regarding the construction of trucks Nos. 96 and 77, the Board said:

"Coming now to the inconsistencies which have been pointed out by the party Romine with respect to the Hodges' record. In the first place it appears that the time records at the Buick plant would indicate that Fleming and his superior Carrol were listed for other duties than those which they stated that they were performing at this time in 1924, while the records indicate a more consistent classification for 1925. Hodges when his attention was called to this discrepancy, stated that it was frequently necessary in the plant to assign men to work other than that called for by their classification in order that they

might be given the compensation to which they were entitled. He did not state that he knew that that had happened with Fleming and Carrol but simply offered that as a possible explanation. Another discrepancy relates to the Elwell-Parker drawings which were submitted to the Buick Company and which Clark stated he thought were received substantially nine months after the completion of the truck. These drawings were dated in 1925, which would be consistent with his statement, but apparently the dating of these drawings in 1925 was not consistent with the serial numbers of other drawings of the Elwell-Parker records, and the '26 date instead of '25 apparently would be more consistent with the order given by the Buick Company for the trucks. However, all of these matters relate to inconsistencies and not direct contradictions. * * *

"We might say that one of the weaknesses and perhaps the greatest of the Hodges' record is that there are so many things that have been left unexplained and of course the failure to provide explanations creates a suspicion that the explanations would not have been favorable to his case. * * *

"It is our opinion that the matters urged by the party Romine do not sufficiently discredit the statements made by the party Hodges' witnesses so as to indicate an attempt to deceive. *As to Hodges' proof of conception, we regard the oral testimony, if it is to be believed, coupled with the truck exhibit as sufficient evidence."* (Italics ours.)

The witness Harry L. Fleming testified that he was employed by the Buick Company on October 8, 1923, and assigned to the "battery department of the electric truck department," in factory 25; that he was working under the supervision of Mr. Carrol, "foreman of electric truck repair under Mr. Hodges"; that he (Carrol) asked him if he thought it would be "possible for him to put four wheels under the platform of an electric truck and steer them"; that he replied that he thought it could be done; that he "began to make some preliminary sketches" (they were not introduced in evidence, nor is there anything to establish that he ever finished them); that he did all of the work on truck No. 96; that he started work on it the latter part of November or the early part of December, 1923, and completed it in the *latter part of June, 1924;* that the truck was then turned over to factory No. 12, where it was used thereafter in hauling sheet steel from cars; that, on orders from

Mr. Carrol, about two or three weeks after the first truck, No. 96, was completed, he started work on the second truck, No. 77, which he completed about the *middle of November, 1924; and that Mr. Carrol left the employ of the Buick Company a short time after the first truck, No. 96, was completed.* When asked to explain how he fixed the time of his work on the two trucks, he said: "Well, it was only just a very short time just prior to the holidays that Carrol came to me; that is fastened in my mind by the fact that almost immediately after I came to work for the Buick I began to hear talk of a holiday layoff. I know it impressed on my mind that there would probably be something to keep busy on. *I could not fix absolutely the date of completion of that truck;* I know it has been in my mind all the time that I did about six months work on it altogether." (Italics ours.)

On cross-examination the witness stated that Mr. Carrol was foreman of the electric repair department when he entered the service of the Buick Company in October, 1923; that he thought that Mr. Carrol was not foreman of that department when the second truck, No. 77, was completed.

The witness Elgin G. Clark stated that he was an employee of the Buick Motor Car Company; that his "duties since 1922 were general foreman of Electrical Maintenance and later on was promoted to general foreman of Electrical and Mechanical Maintenance"; that he was directly under the supervision of appellee, Walter E. Hodges; that the maintenance of electric trucks was directly under his supervision; that the two electric lift trucks corresponding to the count in issue were constructed during the years 1923 and 1924; that the first truck was *completed in the early part of 1924,* and the second was built around *May, June, or July, 1924;* that both trucks were put in service and have been operated by the Buick Motor Car Company since that time. When asked how he fixed the time when the work was begun and finished on those two trucks, he said: "I established this date from the employment record of the Buick Motor Car Company inasmuch as Mr. Harry Fleming was hired on October 8th, 1923, and Mr. Robert Carrol left the service of the Buick Motor Car Company on February 8th, 1924. It was during the period of time that both of these men worked in the employment of the Buick Motor Car Company that this electric truck was under the process of construction. * * * Mr. Robert Carrol was foreman of the electric truck repair department and Mr. Harry Fleming was one of our very best mechanics, and these two men did a considerable amount of the labor performed on the truck."

He further fixed the time by saying that, in July, 1924, the Automatic Transportation Company of Buffalo was having "difficulty steering six wheels on short radiuses," and that that company paid his expenses to Buffalo in order that he might explain "what experience" he "had had in building the Hodges truck in question"; that he stopped off in Cleveland, visited the factory of the Elwell-Parker Company, and saw some sketches of that truck; that, some time prior to his trip to Buffalo and Cleveland, representatives of the Elwell-Parker Company and the Automatic Transportation Company, both of which companies were manufacturers of electric lift trucks, visited the Buick factory in Flint, Mich., and spent about three days examining, taking dimensions, and making sketches of the new Hodges truck with a view of submitting drawings thereof, as the Buick Company was contemplating the purchase of new trucks of that design; and that the representatives referred to were Mr. Price and Mr. Cochran of the Elwell-Parker Company, and Mr. Geofer and Mr. Gordon of the Automatic Transportation Company. (Those representatives were not called as witnesses by appellee.)

It may be said at this point that, although the witness Clark and other witnesses for appellee evidently intended by their testimony to give the impression that the two companies above referred to sent representatives to the factory of the Buick Company early in 1924 to take dimensions, and make sketches, of the new Hodges truck for the purpose of having drawings made of it so that they could build trucks of that design for the Buick Company, appellee failed to offer in evidence any correspondence between the Buick Company and those companies to substantiate those facts.

The witness Clark further stated that he recalled the time he made the journey to Buffalo and Cleveland by the fact that, while returning to Flint, Mich., he spent a short time in Lorain, Ohio, viewing the damage to that city caused by a tornado, which occurred in the latter part of June, 1924; that, in about nine months after his visit to Buffalo and Cleveland, the Elwell-Parker Company submitted drawings of the new Hodges truck. He identified the drawings referred to, which were dated, respectively, March 1, 9, 11, and 18, 1925. (It was clearly established by testimony introduced by appellant

that those drawings were wrongly dated by the Elwell-Parker Company; that they were not made until 1926, and should have been dated March 1, 9, 11, and 18, 1926.) He said that he was in error in stating that Mr. Robert Carrol left the employ of the Buick Motor Car Company February 8, 1924; that, instead of leaving the employ of the company on that date, Mr. Carrol was transferred from department 89–C, as electric truck repairman, to the "foreman's department"—99–B. He also identified Appellee's Exhibits 16, 17, and 18, which he stated were reports made by him showing the amounts expended for material and labor in the maintenance and repair of trucks operated by the Buick Company for the months of November and December, 1923, and April, 1924; that, in addition to its number and other marks of identification, each truck undergoing experimental work was identified by the letter (X); and that, as the letter (X) appeared opposite the truck designated as No. 96, he recalled that it was then being rebuilt by the witness Fleming. It appearing that trucks Nos. 70, 72, 98, 123, and 125 were marked with the letter (X), the witness was asked whether those trucks were undergoing experimental work, and, if so, to state the nature of it. He replied that truck No. 70 was then undergoing some experimental changes in order to ascertain whether ball bearings could be used "in the trailing wheels," in place of roller bearings. He did not state the nature of the experimental work then being done on trucks Nos. 72, 98, 123, and 125. He further said that reports of the character of Exhibits 16, 17, and 18 were discontinued "about the middle of 1924"; and "that reports for other months had been destroyed." He also stated that the work of building truck No. 96 was performed by the witness "Fleming, Mr. Robert Carrol, Mr. Pattinson, Mr. Jewell, LaVolett." (It will be recalled that the witness Fleming testified that he did all of the work on that truck.)

Robert Carrol was not called as a witness, but it was stated that he was no longer in the employ of the Buick Company, and that his whereabouts was unknown.

Neither Mr. Pattinson nor Mr. LaVolett was called as a witness, nor was any explanation offered by appellee as to why they were not called.

The witness Herschel E. Cooke testified that he was employed by the Buick Company as stock keeper at factory No. 12 from the early part of 1922 to about March, 1925,

when he was transferred to factory No. 16 and placed in charge of several factories, including No. 12; that during the time he was stock keeper in factory No. 12 his duties "were to supervise the receipt and disbursement of all materials, also account for the same; see that equipment such as trucks, shears, and other mechanical equipment was kept in suitable repair and a sufficient quantity on hand to perform the required work"; that he had charge of the unloading of sheet and strip steel from freight cars and storing it in the stockroom; that during 1923 and early in 1924 his department was using electric trucks having a capacity of about 4,000 pounds for hauling the steel; that the trucks were too small and were constantly being overloaded, and that therefore during the latter part of the year 1923, and the early part of the year 1924, he talked to the witnesses Hodges and Clark with regard to the situation; that during the summer of 1924 Hodges and Clark brought a truck to factory No. 12 having a capacity of 10,000 pounds; that it differed from other trucks "around the plant," in that it had "four wheels to steer by instead of two," and had six wheels in all; that there were "two sets of small wheels, one set about 14 inches behind the other at the front end of the platform, and two larger wheels about 18 inches in diameter at the back of the truck underneath the motor and battery"; that it was not entirely satisfactory at that time and was taken to factory No. 25; that in a few days thereafter it was returned and again tested; that it then operated satisfactorily and was left in his department as "regular equipment"; and that a short time thereafter another truck of the same type was built. When asked to explain how he fixed the time of the construction of the two trucks in question, he said: "By the fact that it was shortly before there was talk of transferring me from this department and the fact that I made a survey at the request of Mr. Thompson who is general supervisor of stores to determine how much additional stock room equipment that would be required to increase our production to 1,000 jobs per day. In this report I stated the amount of equipment which was on hand in Factory 12, and what additional equipment would be required."

Although the report referred to by the witness was neither introduced in evidence nor accounted for, a copy of it was identified by him and introduced in evidence as Hodges' Exhibit 12. It was dated January 5, 1925, and the witness stated that it was prepared during the months of December,

1924, and January, 1925. It was addressed to Mr. W. E. Thompson, who, the witness stated, was "general supervisor of stores." Strangely enough, neither Mr. Thompson nor any other person having knowledge of the facts was called to corroborate Mr. Cooke's testimony relative to that report. Among other things, the exhibit contains the following: "At present Fact. #12 have 5 Electric Trucks operating in the Stock Dept., 2 are 5-Ton capacity and 3 are 2-Ton capacity. They should have 6 Electric Trucks in all and they should be 5-Ton or greater in capacity."

The witness stated that he knew that the two trucks of five-ton capacity, mentioned in Exhibit 12, were the two trucks, Nos. 96 and 77, built in the Buick factory, because they were the only five-ton capacity trucks in use in "our plant and the only ones that I had ever seen." He also said that he was aided in fixing the year 1924 as the time when the trucks were constructed by a memorandum received from the "safety engineer" of the Buick Company, dated October 13, 1925, in which he was criticized for overloading the two five ton electric trucks. A copy of the memorandum was identified by the witness and introduced in evidence as Hodges' Exhibit No. 13. The witness stated that the original could not be found, and that he obtained the copy introduced in evidence from his files. The pertinent part of the memorandum reads as follows:

"Some time ago this department was instrumental in obtaining the completion of two electric trucks of five ton capacity to remove stock from the cars to factory #12. At that time it was stated that the use of these trucks would eliminate the possibility of overloads which were then prevalent.

"Upon checking up we find that on October 12th one of these trucks had a load of 11,944 pounds and the other 10,449 pounds. The overload on the one was seemingly slight but the other one was overloaded approximately 20%."

The writer of the quoted memorandum was not called as a witness, nor was there any explanation offered as to why he was not called. The memorandum is dated October 13, 1925, and the matters therein complained of occurred on October 12, 1925. Accordingly, it is not inconsistent with the view that the trucks in question were built in 1925.

Appellee, Hodges, testified that the two trucks in question were constructed during the years 1923 and 1924. However, he admitted that he testified solely from memory. He did not explain how he fixed the time of the development and construction of the trucks, nor was he interrogated in regard thereto.

The witness Harold D. Gumpper stated that he was a member of the firm of Gordon & Gumpper "manufacturers' agents" during 1923 and part of the year 1924; that the firm represented the Automatic Transportation Company, manufacturers of electric trucks, Buffalo, N. Y.; that, while a member of the firm of Gordon & Gumpper, in 1923, he started to manufacture "gasoline electric power plants"; that during the first half of the year 1924 he visited the Buick factory, and there saw "a lift truck with four wheels under the load platform" in process of construction; that it was built from a standard electric truck; and that he saw the truck in operation during the months of May or June, 1924. When asked how he recalled the time when he saw the truck, he said: "By referring to records of power plants shipped to Buick Motor Company, the first half the year in question." The witness then identified two orders for "gas-electric battery replacement units," the first dated January 4, 1924, and the second dated February 29, 1924. He also identified four invoices addressed to the Buick Motor Car Company dated, respectively, April 12, May 7, May 10, and May 15, 1924, all of which were introduced in evidence as Hodges' Exhibit 19. The witness stated that, as the "power plants" sold to the Buick Company were the first he had produced, he observed their operation very carefully, and therefore visited the Buick factory frequently, and, on such occasions, was in contact with Mr. Hodges, Mr. Clark, Mr. Carrol, and other employees of the Buick Company. On cross-examination he stated that he had sold similar plants to the Buick Motor Car Company in 1925, but that he did not recall whether he had sold any to that company in 1926. He also stated that, although he could not recall positively when the partnership of Gordon & Gumpper was terminated, he was of the impression that it was July 1, 1924.

The witness David C. Parry testified that during the years 1924 and 1925 he was employed by James Alex Gordon, local representative of the Automatic Transportation Company of Buffalo. (The Mr. Gordon referred to was the senior member of the former firm of Gordon & Gumpper.) He stated that he *believed* he had made a trip with Mr. Clark and Mr. Gordon to Buffalo to visit the Automatic Transportation factory;

that the purpose of the trip was to give Mr. Clark an opportunity to explain to the latter company an arrangement for steering a truck having six wheels. He further said that he and the witness Clark drove from Buffalo to Cleveland, Ohio, and that, after leaving Cleveland, he recalled "going through Lorain to witness the remains of the flood which had happened a few days previous." He did not state that either he or Mr. Clark visited the Elwell-Parker Company of Cleveland on that trip, nor was he interrogated in regard thereto.

Counsel for the parties stipulated during the taking of the testimony of appellee, Hodges, that, if Mr. John Burley were called as a witness, he would testify that he was in "charge of the record department of the employment office of the Buick Motor Car Company"; that the "employment cards of Robert R. Carrol and Harry L. Fleming," introduced in evidence as Hodges' Exhibit 15, disclosed that:

" * * * Harry R. Fleming * * * entered the employ of the Buick Motor Car Company on October 8, 1923, and was assigned to clock number 77225, factory 25, department 89-C, i. e., general repair department; that his classification was 1908, i. e., elevator repair man at the rate $.625 per hour; that he was transferred on November 8th, 1924, to clock number 77138, factory 25, department 89-D, i. e., electric truck repair department, and that his classification number was 1916, i. e., electric truck repair man at the rate of $.625 per hour; and that he remained in said department 89-D until March 10th, 1926, and that he is still in the employ of the Buick Motor Car Company;

"That the employment card of Robert R. Carrol shows that he was first employed on August 4, 1922, in factory 25, department 89-C, i. e., general repair department, in the capacity of repair man designated as 1913 at the rate of $.55 per hour; that on February 8, 1924, he was transferred in factory 25 to Department 99-B, i. e., foreman's department, classification 809-A, i. e., foreman, at the rate of $.675 per hour; that he remained under this classification until 12/10/24, when he was transferred in factory 25 back to department 89-C, i. e., general repair department in the capacity of 1902, i. e., repair man, remaining at $.675 per hour and that he remained on this job until 3/3/25, when he was laid off. The last line on this card indicates that he was reengaged on May 9, 1925, but did not appear, for which reason there is an exit designation bearing the same date 5/9/25.

"In explanation of the 'foreman's department,' referred to above and designated as 99-B, all foremen in the Buick plant are assigned to this department and each factory has its foremen's department. Moreover, all foremen are designated by one of the three numbers, 809, 809-A, or 809-B."

The attention of appellee, Hodges, was called to the fact that the witness Fleming was employed as an elevator repairman in the general repair department from October 8, 1923, to November 8, 1924, and was not, during that period of time, according to the employment records of the company, in the electric truck repair department. When asked to explain how the witness Fleming could have worked on truck No. 96 prior to November 8, 1924, the witness stated that they were allowed a certain number of first, second, and third grade men in the truck department, "and the rate not being high enough, it was probable that it was necessary for us to carry him in another division in order to give him the rate which we thought he was worth. This case happens many times as they will not allow us only so many men at the top rate, and we will juggle our men from one department to another." The witness stated, however, that he had no independent recollection that Fleming was carried in one department while working in another. (The witness Fleming was not asked to explain the matter.)

Furthermore, no witness attempted to explain how Carrol, who, in November and December, 1923, and January, 1924, was a repairman in the general repair department, factory 25, drawing less wages than Fleming, who received $.625 per hour, could have been a foreman in the electric truck repair department during those months, as claimed by the witnesses Fleming, Clark, and Hodges. The record shows that he was made a foreman on February 8, 1924, and his wages increased from $.55 to $.675 per hour, and that he retained that position until December 10, 1924, when he was again transferred to the general repair department as a repairman, where he continued to draw $.675 per hour until March 3, 1925, when he left the employ of the Buick Motor Car Company.

Appellee introduced in evidence various photographs of the electric lift trucks, Nos. 96 and 77, built in the Buick factory, which were obviously taken for the purpose of showing that the involved invention was em-

bodied in those trucks. Some of the photographs of truck No. 96, the first constructed in the Buick factory, have endorsed thereon in column formation the following: 7432-a, 6–7–24, some, 7432-c, 6–17–24, and at least one, 7432-d, 6–17–24; others of truck No. 96, dated 4–16–30, bear serial number 12962, with the letters a, b, c, d, e, f, g, and h, respectively. The photographs of truck No. 77 have indorsed thereon in column formation the serial number 12961, with the letters a, b, c, d, and e, respectively, and the date 4–16–30. The record does not disclose when, or by whom, the photographs were taken, nor who had possession of them from the time they were taken until they were offered in evidence.

Appellee knew, of course, at the time of the taking of the testimony, that, if it could be established that the photographs of truck No. 96, dated June 7 and 17, 1924, had been taken on those dates, his case would have been materially strengthened. Nevertheless, so far as the record is concerned, no effort was made by appellee to establish those facts, nor was any explanation offered for his failure to do so.

In view of those circumstances, counsel for appellant contends that the photographs dated in June, 1924, were misdated, and that this was done to intimidate and discourage appellant, and also for the purpose of perpetrating a fraud upon the Patent Office and this court.

In this connection, it may be said that, as the photographs of truck No. 96, bearing dates of June 7 and 17, 1924, were obviously taken for the purpose of showing that the involved invention was embodied in that truck, and as there was no controversy in June, 1924, nor, so far as we are informed, for a considerable period of time thereafter, relative to the question of priority of invention, appellee's failure to prove the dates when those photographs were taken, or to offer an explanation as to why such proof could not be submitted, must be considered along with the many inconsistencies in the testimony submitted by appellee and the many peculiar circumstances surrounding his case, for which no explanations were offered.

In its decision, the Board of Appeals stated that the photographs were not relied upon for any particular purpose. It is true that trucks Nos. 96 and 77 were introduced in evidence. Nevertheless, the photographs were used by some of the witnesses for appellee to aid them in the giving of their testimony, and they were introduced in evidence for the purpose of aiding the tribunals of the Patent Office and this court to determine whether the invention in question was embodied in those trucks. But, whatever may have been the purpose of their introduction, the tribunals of the Patent Office and this court were entitled to an explanation as to whether those bearing dates of June 7 and 17, 1924, were misdated, and, if so, why.

The witness Cochran, testifying for appellant, stated that he did not see either of the trucks until December, 1925, although it appears from the evidence that he was at the Buick factory two or three times during the year 1924 and as many times during the year 1925, prior to December of that year.

Appellant introduced in evidence the following letters, Romine Exhibit 136: One, signed by W. J. Brewer, assistant purchasing agent of the Buick Motor Car Company, addressed to Mr. Frank E. Price of the Elwell-Parker Electric Company, Detroit, Mich., dated September 29, 1925, in which it was stated: "Mr. Hodges now advises the writer that he has completed another Pony Truck at our plant; therefore, I believe that it would be a good plan, on your next visit to Flint, to drop in and look this truck over." On September 30, 1925, Mr. Price replied to the letter from Mr. Brewer stating that the chief engineer of the Elwell-Parker Electric Company expected to be in Detroit in the near future, and at that time both he and Mr. Price would visit the Buick factory and "go over this matter carefully with you." On the same day Mr. Price wrote to Mr. Towson of the Elwell-Parker Electric Company of Cleveland, Ohio, calling attention to the letter received from the Buick Motor Car Company, and on October 3, 1925, the witness Cochran, chief engineer of the Elwell-Parker Electric Company, replied to the letter of September 30, from Mr. Price, and, among other things, said:

"We have your letter of September 30th concerning the above subject in which you advise that the Buick engineers have some interesting facts and changes to disclose to us in the near future.

"The writer will arrange to come to Detroit when the 20,000 pound lift truck has been shipped to the Hudson Motor Co."

The "20,000 pound lift truck," referred to in the quoted excerpt, was built by the Elwell-Parker Company for the Hudson Motor Company at the request of appellant,

Romine, and embodied the invention in issue.

On October 6, 1925, Mr. Brewer, the assistant purchasing agent of the Buick Motor Company, replied to the letter of September 30, stating in substance that the Buick Company would be glad to receive a visit from Mr. Cochran in the near future.

With regard to the correspondence between the Buick Company and the Elwell-Parker Company, contained in Romine Exhibit 136, it may be said that if, in the year 1924, the Buick Company really contemplated purchasing trucks of the Hodges design from either the Elwell-Parker Company or from the Automatic Transportation Company, and if truck No. 96 was completed in the latter part of June, 1924, as stated by the witness Fleming, or at an earlier date, as stated by the witness Clark, and if truck No. 77 was completed about the middle of November, 1924, as stated by Fleming, or if it was "built around May, June and July, 1924," as stated by Clark, it is strange indeed that the assistant purchasing agent for the Buick Company, Mr. Brewer, should write to the Elwell-Parker Company on *September 29, 1925*, approximately one year after the second truck, No. 77, was completed, and say that "Mr. Hodges *now advises* the writer that he has completed another Pony Truck at our plant," and suggest "that it would be a good plan," on his next visit to Flint for Mr. Price, a representative of the Elwell-Parker Company, to "look this truck over." (Italics ours.)

Mr. Brewer was called as a witness *by appellant,* and stated that the letters of September 29 and October 6, 1925, hereinbefore referred to, were signed by him. The witness was cross-examined by counsel for appellee, and stated that appellee called at his (the witness') office "possibly once in every two or three weeks" during the year 1925. He was not asked how frequently appellee visited his office during the year 1924, nor was he asked when he first saw or heard of trucks Nos. 96 and 77. He did testify, however, that his "contact" with appellee was "with respect to" the purchase of materials and supplies desired by appellee for his department. Why, in view of the relationship existing between them and their departments, did appellee wait until September, 1925, to advise Mr. Brewer of the completion of truck No. 77? Why was there no correspondence on the subject, if, in July, 1924, as stated by the witness Clark, both the Elwell-Parker Company and the Automatic Transportation Company were preparing drawings of the "new Hodges truck," for the purpose of supplying the Buick Company with trucks of the new design? And, finally, why did appellee leave it to appellant to introduce in evidence the correspondence of September and October, 1925, between the Buick Company and the Elwell-Parker Company?

Appellee's witnesses testified approximately six years after the happening of the events they attempted to recall from memory.

There are many inconsistencies and errors in the testimony relative to the incidents by which it was attempted to fix the time when the two Hodges trucks, Nos. 96 and 77, were constructed. There are also many singular circumstances which appellee failed to explain. In fact, there are so many, and they are so unusual, as to create the suspicion that explanations were deliberately avoided. We have pointed out some of the inconsistencies and errors in the testimony, and some of the unusual circumstances, which should have been, but were not, explained. There are many others.

Considering the testimony "in the light of human experience and" with "such knowledge of human nature as the courts possess," together with the circumstances surrounding the transactions testified to by appellee's witnesses, Jardine et al. v. Long, 58 F.(2d) 836, 19 C. C. P. A. 1243, we are clearly of opinion, as was the Examiner of Interferences, that appellee has failed to establish that the involved invention was embodied in truck No. 96 prior to the latter part of June, 1925, or in truck No. 77 prior to September of that year.

It is true that, in spite of inconsistencies and errors, testimony may be of sufficient probative force to establish essential facts. George H. Jung, Jr., v. William M. Scholl, 37 F.(2d) 761, 17 C. C. P. A. 805. However, in the case at bar, there are so many inconsistencies and errors in the testimony introduced by appellee, and so many singular and unexplained circumstances in his case, as, in our opinion, to make a finding in his favor impossible.

For the reasons herein stated, we are of opinion that appellant was the first to conceive the invention, that he was diligent in reducing it to practice, and that therefore he is entitled to an award of priority.

The decision of the Board of Appeals is reversed.

Reversed.